Bartley, C. J.,
dissented.
I regret that I can not concur in the opinion of the majority of' the court in this case. And the question involved is of such a nature as to require a statement of the reasons of my dissent, which. I shall endeavor to give with all the brevity consistent with perspicuity.
I know nothing of the influences, local or political, which have-operated either in favor of, or against the new county of Noble. I consider the case before us as involving purely a question of constitutional interpretation.
I recognize the doctrine, that a law shall not be adjudged void on-the ground of unconstitutionality, unless it be in a case of clear and undoubted conflict with some provision of the constitution. But where that conflict with the constitution does plainly exist, it is the-imperative duty of the court, without the slightest shrinking from the responsibility or delicacy of the question, to declare the law unconstitutional and void.
The investigation of this case has brought my mind to the clearest conviction of the following conclusions :
1. That the law creating the county of Noble was clearly inconsistent with the express provisions and plain intent of the present, constitution of the state when it took effect on the first day of September, 1851.
2. That this inconsistency abrogated the law, and was fatal to the-existence of the new county.
No one will presume to controvert the position that all laws of the state inconsistent with any express provision and the clear intent of the constitution were abrogated when the constitution went into-operation. The framers of the constitution deemed it even necessary to provide in the first section of the schedule that all laws consistent with the constitution should continue in force until amended or repealed.
*A county is a municipal corporation covering a certain portion or district of country, instituted as a department of the-state for the purposes of the more convenient administration of justice, and the better government of the territory included. That the framers of the constitution had the power to abrogate existing *389 «counties and authorize new and different county organizations cannot be denied.
The right of suffrage, the right of representation in the general .assembly of the state, and the right to the use of the judicial ■tribunals for the administration of justice, are fundamental rights guaranteed by the constitution to all the citizens of the state. The county organizations are designed chiefly to aid in the more convenient and useful exercise of these important functions. And, 1 presume, it will not be controverted that, if, when the present constitution went into operation, there was any county organization not recognized in the constitution, the existence of which would have deprived any portion of the people of the state of either one of these fundamental constitutional privileges, that such county was •abrogated by the constitution.
The first section of the fifth article of the constitution secured to ■every white male citizen of the age of twenty-one years the right “ to vote at all elections.” And, according to the fourth section of the same article, no person can be excluded from the privilege of voting, or of being eligible to office, except a person convicted of some infamous crime.
Any law which, in its operation, would have abridged this right of suffrage, or eligibility to office, as to any portion of the citizens of the state, at any election, or in the election of any officer, would have been in conflict with this provision of the constitution.
The third section of the fourth article of the constitution contains the following:
“The state shall be divided into nine common pleas districts, of which the county of Hamilton shall constitute one, of compact territory, and bounded by county lines; and each of said districts, •consisting of three or more counties, *shall be sub-divided into three parts of compact territory, bounded by county lines, and •as nearly equal in population as practicable; in each of which one judge of the court of common pleas for said district, and residing therein, shall be elected by the electors of said sub-division. .Courts ■of common pleas shall be held, by one or more of these judges, in-•every county of the district,” etc.
Pursuant to this provision, the whole state is apportioned into judicial districts and subdivisions by'the twelfth section of the eleventh article, in which every county in the state, at the time the constitution was framed, is named, the county of Noble, of course, *390 not being among the number. This apportionment of the state,, for judicial purposes, has express reference to the geographical' limits of each county as it then existed, and without which the apportionment for the whole state could not have been perfect; and' each of the districts, as well as each of the subdivisions, was bounded' by county lines. In this apportionment, a part of the territory-taken to compose the county of Noble was included in the seventh judicial district, and another part in the eighth judicial district; a part was included in the third subdivision of the seventh district,, a part in the first subdivision of the eighth district, and another' part in the second subdivision of the eighth district.
The constitutional convention adjourned on the tenth day of March, 1851; the law for the creation of the county of Noble was-passed by the legislature on the next day, being the eleventh day of March ; the constitution was adopted by the people of the state ■ on the seventeenth day of June, 1851, and took effect on the first day of September following. No legislation could take place under this constitution prior to the first day of January, 1852. And the fourth section of the schedule provided that the first election of judicial officers should take place on the second Tuesday of October, 1851.
If the county of Noble had any legal existence as such county, at the time the constitution went into operation, it could neither-belong to any one of the judicial districts, nor to any one of the-judicial subdivisions, inasmuch as they were *expressly and positively required to be bounded by county lines ; and, as such county, it was attached to none of them. The consequence would, have been inevitable—that the citizens of the territory composing Noble county would have been, by the existence of such county,, disfranchised at the first election of judicial officers, the third section of the fourth article of the constitution requiring that the judge of the court of common pleas of each subdivision should be a resident therein, and elected by the electors thereof. And the county was not entitled to have the court of common pleas held within it, the same article of the constitution authorizing said court to beheld only in the counties belonging to some one of the judicial districts. .
The boundaries of the judicial districts and subdivisions, created' by the constitution, and which existed when the constitution took effect, were the county lines, as is very definitely and clearly ex *391 pressed in the constitution. The creation of Noble county, under the old constitution, between the time when the present constitution was framed, and the time when it was adopted by the people, could not have changed the boundaries of the judicial divisions-prescribed by the new constitution. The existence of Noble county, therefore, as such, at the time when the constitution went into operation, was plainly inconsistent with the express provision that the judicial districts and subdivisions should each be composed of “ compact territory, and bounded by county lines.” If, when the constitution went into effect, on the first of September, 1851, Noble county existed as one of the counties of the state, the judicial districts and subdivisions were not all composed of “ compact territory, bounded by county lines, and as nearly equal in population as practicable.” Consequently, when the op’eration of the constitution commenced, the judicial apportionment was imperfect, and one of the existing counties of the state left out entirely, and no provision made for it. And unless subsequent legislation could remedy the difficulty, Noble county could never have had a court of common pleas. Appeals from the judgment of justices of the *peace, within the territory of Noble county, would either have been prevented altogether, or been carried to the common pleas of the different counties from which the territory of Noble was taken. No appeals could be taken from the county commissioners, and the court of the probate judge would be the court of last resort in the county. The citizens in one part of the territory would have sued and been sued in the court of common pleas in one county, while the citizens of another part would have sued and been sued in a different court of common pleas, and in a different county—a difficulty which the framers of the constitution undertook, by express provision, to prevent.
The constitution contains no provision to meet the event of the creation of an additional county between the time when it was framed and the time when it went into operation. This is undeniable. The test, however, whether the county of Noble was abrogated is its consistency with the provisions of the constitution at the time when it took effect, and not-the possibility of amending or removing the inconsistency by subsequent legislation. All laws inconsistent with the constitution at the time when it wont into operation were abrogated or annulled. If Noble county was inconsistent with the constitution on the first day of September, 1851, *392 it lost its vitality as a legal existence, and could not have been revived by subsequent legislation without pursuing the forms of creating a new county prescribed in the 30th section of the 2d article of the present constitution.
The fifteenth section of the fourth article of the constitution provides that, “ The general assembly may increase or diminish the number of the judges of the supreme court, the number of the districts of the court of common pleas, the number of judges in any district, change the districts, or the subdivisions thereof, or establish other courts, whenever two-thirds of the members elected to ■each house shall concur therein.”
, This furnishes no remedy for the difficulty. It does not authorize the annexation of a new county not previously ^included in the apportionment to any existing district or subdivision. It .simply provides for a change in the boundaries of the districts and subdivisions as already made by the constitution, when other courts shall be established, or the number of the judicial districts, •or the number of the judges in any district, shall be either increased or diminished by legislation under the new constitution. The context of the whole sentence must be taken together. The authority to change the districts or subdivisions here conferred, is coupled with the exigencies which may make it necessary, and upon which alone it can be exercised. And this change, however, could only be made by subsequent legislation, after the general assembly shall have been elected and convened under the new constitution, and then only by the concurrence of two-thirds of the members elected to each house. It would seem to me vain, indeed preposterous, to attempt to maintain the legal existence of Noble county by virtue of this provision in the constitution.
The thirteenth section of the eleventh article of the constitution isas follows: “The general assembly shall attach any new counties that may hereafter be erected, to such districts,, or subdivisions thereof, as shall be most convenient.”
This provision can have no reference to counties created either before the constitution went into operation, or before it was adopted bj' the people of the state. Before the 17th of June, 1851, the constitution had no validity. It was nothing more than a proposition submitted to the people for their adoption. By its own. terms it did not become the constitution of the state till it had reoeived the sanction of the people at the ballot-box. It was designed to pro- *393 wide for what should exist or occur under it after it should go into operation. It speaks, therefore, from the time when it took effect as the constitution of the state. The “new counties hereafter erected,” to which this section refers, must therefore be those ■erected after the constitution became operative. It is not pretended that Noble county was erected under the requirements of the present constitution. The thirtieth «section of the second article authorizes the creation of new counties, and prescribes the peculiar mode by which alone they can be made. The thirteenth section above recited must receive a construction with a view to its connection with the other parts of the constitution. And if it be applicable to a new county created before the constitution took effect, the same principle would make the thirtieth section of the second article applicable, and require the erection of the county to be in conformity to its terms.
There is also another part of the constitution, consistently with which I find myself wholly unable to reconcile the existence of Noble county.
The eleventh article of the constitution prescribes the principles and mode for making the apportionment of the state for representation in the general assembly every ten years. And, in accord-dance with these principles, the seventh section of the article contains the apportionment of the representation in the senate, dividing the several existing counties of the state into thirty-three sena-torial districts, for the first decennial period. Also the nineteenth section of the schedule contains the apportionment of the state for the house of representatives, upon the same principles, dividing the ■counties of the state into representative districts, for the first decennial period. These senatorial and representative districts cover the entire state, are made by classifying or arranging into districts all the existing counties of the state, each and every county in the state being named with reference to its geographical boundaries, and the districts, both for senatorial and for representative purposes, being bounded by county lines. In this apportionment, Noble county is omitted.
The tenth section of the eleventh article contains the following provision : “ Ail territory belonging to a county at the time of any ■apportionment shall, as to the right of representation and suffrage, remain an integral part thereof, during the decennial period.”
Now if Noble county existed “ at the time of the apportionment ” *394 for the first decennial period, all the territory ^belonging to» it would remain integral parts of it during that period. It, therefore, becomes a matter of the very first importance to ascertain “ the time ” of this first apportionment, within the meaning of the constitution. And what was it? Was it the time when, according to the journals of the convention, this apportionment was finally adopted and agreed to in the convention ? Was it the time when the convention adjourned, and the constitution was signed by the members of the convention ? Was it the time when the constitution was adopted by the people of the state ? Or was it the time when the constitution took effect ? It could not have been either the time when it was finally adopted in the convention, or the time when the convention adjourned, because at neither of these periods did it become a valid apportionment, or receive such sanction as to make it then, or in future, without further action, the fundamental law of the state. The time of the apportionment, within the meaning of the constitution, was clearly the time when the making of it was consummated, and it became, without any further action, the valid and binding constitutional apportionment of the state, commencing and operating for the period prescribed by its berms. When it was adopted in the convention, it was not, as yet, a valid apportionment of the state. When the convention adjourned, the constitution had not, as yet, become a binding instrument. It was not, as-yet, the constitution of the state. Further action was necessary. The making 'of the present constitution was the act of the people-of the state. The constitution begins by declaring : “We, the people of the State of Ohio, grateful to Almighty God for our freedom, to secure its blessings and promote our common welfare, do establish this constitution.” And the 17th section of the schedule provides that the constitution shall be submitted to the electors of the state, at an election to be held on the third Tuesday of June, 1851, and if it shall appear that a majority of all the votes cast at such election are in favor of the constitution, it shall become the constitution of the State of Ohio, and not otherwise. The making of the constitution was, therefore, the ad of the ^people of the state, and not consummated till their vote in favor of its adoption. The convention was but the agent to prepare the terms of the proposition to be submitted to the principal for adoption. When the time of the making of a deed is referred to, it is not the time when the attorney or agent draws up its terms upon paper that is meant, but *395 the time when the grantor adopts it as his own deed by executing it, and making it a legal and valid instrument.
The constitutions of some of the states did not, by their terms,, require .the ratification of the people, and were, as it has been said, valid instruments from the time they came from the hands of the conventions in which they were framed. Such was the case with the late constitution of the State of Ohio. It was never submitted to the people of the state for their adoption. There was no provision in it requiring this to be done. It acquired its validity,, therefore, from the act of the convention, and became a valid instrument from its date, the time of its final adoption in the convention. But such was not the case with the present constitution of the state. It was not -made, and did not become, the constitution of the state, by its own terms, until the electors of the state had, in due form, made it such, by their adoption at the ballot-box.
“The time of the apportionment,” therefore, was the time when it became the valid constitutional apportionment of the state. And this was when it was ratified and adopted on the third Tuesday of June. Now, if Noble county ever had any existence as a county, it existed at that time. The consequence was that when the constitution went into operation, on the first day of September, 1851, if the county of Noble continued to exist, it was plainly in violation, either of the provisions of the constitution making the apportionment, and including its territory, as to the right of representation and suffrage, in the different senatorial and representative districts with the four several counties from which it was taken; or in violation of the provision in the tenth section, that all territory belonging to a county, “ at the time of any *apportionment,” shall remain an integral part thereof during the decennial period. If the latter, then the apportionment of the state was impei'fect, and the existence of Noble county would deprive the people of the territory composing that county of the constitutional right of representation and suffrage during the first decennial period—a right which the second and third sections of the eleventh article provided that every county of the state should have, in accordance with the ratio of representation therein prescribed. But this is not all. The counties from which the territory and population of Noble were taken, being reduced, would not, on the principle adopted,m the constitution, be entitled to the full representation *396 given to them severally in the apportionment for the first decennial period.
It is clear that, in the formation of the constitution, no such thing was contemplated .as the creation of a new county, between the time of the adjournment of the convention and the time when the new constitution should go into operation. Had such an event been contemplated, as a valid change in the county organizations of the state, it evidently would have been provided for in the constitution. Three several times are all the existing counties of the state named in the constitution, with direct reference to their existing boundary lines. It was the evident intention of the constitution that the judicial districts and subdivisions, as well as the senatorial and representative districts, should all be bounded by •county lines, and should include all the counties of the state, at the time when the constitution should go into operation. It is to be presumed that if any change in the county organizations of the .state was to be allowed, it would have been provided for. It is true, the constitutional convention had not the power to arrest the exercise of the authority of the legislature, under the former constitution, prior to the time of the new constitution taking effect. But it was sufficient to provide that only such laws as were consistent with the constitution should continue in force.
*It is said that the same difficulty will arise whenever any new county may be made under the provisions of the present constitution. This is not correct. The constitution expressly provides for the existence and rights of new counties erected in conformity to its own terms, but it makes no provision for such a contingency as the erection of a new county between the time when the constitution was framed and the time of its adoption.
If the erection of one new county, thereby altering the boundaries of several of the old counties, could have been made between the time when the constitution was framed and the time of its adoption, and continue in force after the constitution took effect; upon the same principle a law passed at such time and in the same manner, changing the boundaries of all the counties of the state, or repealing all existing counties, and erecting an entirely new system of counties throughout the state, could have been sustained. Suppose, for illustration, that, after the adjournment of the convention, but before the adoption of the constitution, the legislature had passed a law erecting an entire new system of counties throughout *397 the state, and making the boundaries of all the counties different from what they had been. What would have been the result?' Would the purposes of the new constitution have been defeated?' Would the election of officers and the administration of the government have commenced under the new constitution with the county organizations as recognized by it, or as changed by the legislature ? Would the boundaries of the judicial districts and subdivisions have been changed throughout the state? How could the-new counties have been attached to the districts and subdivisions-composed of the old counties ? Would the election of one part of the public officers have taken place under one set of counties, and the election of other officers under other and different county organizations? Would the judges of the courts of common pleas-have been elected and their courts held under one system of counties, and the probate judges, county officers, and justices of the-*peace have been elected and done business under another and different system of counties ? This shows the inconsistency and utter confusion to which the doctrine upon which Noble county is sustained would lead if carried out to the full extent.
Suppose, again, for example, that the legislature had passed a law repealing all the existing counties of the state, between the time of the adjournment of the convention and time of the adoption of the constitution. Would that have defeated the operation of the new constitution? Would that have prevented the election, for the adoption of the new constitution? Would the first election for state and county officers under the new constitution have been defeated ? Certainly not. The counties, at the time the constitution was framed, with their boundary lines as then existing, and contemplated by the constitution, would have been continued and' upheld by virtue of the constitution itself. The constitution contained the elements of vitality within itself, and such repealing law would have fallen by its inconsistency with the constitution, and the counties named in the constitution, and repeatedly referred to in almost every article, would have been continued till changed by legislation in conformity to its provisions.
It is the plain and evident intention of the constitution, apparent from the context of the whole instrument, that the counties of the state, as repeatedly named and recognized in it, and with their-geographical limits as existing at the time of its formation, should, continue until changed by legislation under its provisions.
*398 It is said that some local inconvenience and difficulty connected with the public business would have arisen from the abrogation of Noble county by the operation of the new constitution. If the barriers of the constitution are to be broken down, or its provisions frittered away either by strained or loose construction, induced by considerations of convenience or expediency, the people of the state will soon find that the boasted safeguards of their constitution are •delusive and inefficient.